UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HENRY HILL, et al.,

        Plaintiffs,                 Case No. 10-cv-14568
                                     Hon. Mark A. Goldsmith

vs.

RICK SNYDER, et al.,

        Defendants.

_____/

### OPINION & ORDER
### GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTION (Dkt. 181), DENYING DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 190), AND GRANTING PLAINTIFFS' SECOND RENEWED MOTION FOR CLASS CERTIFICATION (Dkt. 180)

       The United States Supreme Court has ruled that juveniles convicted of first-degree murder cannot be subject to mandatory life sentences without parole. Because of their lesser culpability and greater capacity to change, they must be sentenced under a process that gives them an individualized opportunity to present mitigating circumstances to avert such a harsh sentence. In response, the Michigan legislature enacted legislation that purported to comply with the Court's ruling, which included the possibility of being resentenced to prison for a term of years. However, the legislature provided that in calculating any such sentence, the youth offenders were not to receive any credit – known as good time or disciplinary credit – even though such credits were earned while the youth offenders served their illegally imposed sentences. In that respect, the legislative response ran afoul of our Constitution's ban on ex post facto laws – the constitutional guarantee that laws may not retroactively criminalize conduct or enhance the punishment for criminal acts already perpetrated. For this reason, the Court must declare that provision of the

statute unconstitutional and order that the youth offenders receive the credit that they have previously earned.

## I. BACKGROUND

This matter is currently before the Court on competing motions of the parties, for which a hearing was held on March 22, 2018. For the following reasons, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment, declaratory judgment and permanent injunction (Dkt. 181); denies Defendants' cross-motion for partial summary judgment (Dkt. 190); and grants Plaintiffs' second renewed motion for class certification (Dkt. 180). [1]

Plaintiffs are individuals who were sentenced to mandatory life without parole for homicide crimes that they committed as juveniles. From the outset of the case over seven years ago, they have alleged that Michigan's sentencing scheme violates their constitutional rights by depriving them of a meaningful opportunity for release – first challenging their mandatory sentences of life without parole, and now, in light of the Supreme Court's decisions in Miller v. Alabama, 567 U.S. 460 (2012) and Montgomery v. Louisiana, 136 S. Ct. 718 (2016), they challenge Michigan's statutes, policies, and procedures implemented in the post-Miller world.

In Miller, the Supreme Court held that a mandatory sentence of life without parole for a juvenile offender convicted of homicide violated the Eighth Amendment's prohibition on cruel and unusual punishment. In Montgomery, the Court held that Miller applied retroactively.

---

[1] This case is before the district court on remand from the United States Court of Appeals for the Sixth Circuit for the second time, see Hill v. Snyder, 878 F.3d 193, 200 (6th Cir. 2017) ("Hill II"), which opinion is discussed at length infra. This case was originally assigned to the Hon. John O'Meara and reassigned to the undersigned following the second remand. See 1/19/2018 Order (Dkt. 184). In its first remand, the Sixth Circuit vacated the district court's prior orders and remanded with instructions to grant the parties leave to amend the pleadings and supplement the record, to account for the significant legal changes that had occurred since Plaintiffs had first filed their complaint. See Hill v. Snyder, 821 F.3d 763 (6th Cir. 2016) ("Hill I").

Michigan law had previously provided that youth offenders who were convicted of first-degree murder were ineligible for parole.  See Mich. Comp. Laws § 750.316 (life imprisonment without parole for first-degree murder); Mich. Comp. Laws § 791.234(6)(a) (ineligibility for parole for individuals convicted of first-degree murder under § 750.316).  Following Miller, the Michigan legislature enacted new statutory provisions to ensure that juveniles convicted of first-degree murder would not be sentenced to mandatory life imprisonment without parole.[2]  As explained by the Sixth Circuit:

> Michigan amended its sentencing scheme to prospectively address the effect of Miller.  The Legislature enacted a new statutory provision, which covered both juveniles convicted of first-degree homicide after Miller and those juveniles whose cases were still pending or eligible for direct appellate review at the time of the statute's enactment.  See Mich. Comp. Laws § 769.25.  This new provision allows prosecutors to seek life-without-parole sentences for juveniles convicted of first-degree homicide crimes by filing a motion specifying the grounds for imposing that punishment.  Id. § 769.25(3).  It also requires courts to conduct a hearing on such motions, where the judge "shall consider the factors listed in Miller v. Alabama, . . . and may consider any other criteria relevant to its decision, including the individual's record while incarcerated."  Id. § 769.25(6) (citation omitted).  If the court does not sentence the individual to life without parole, the court must sentence the individual to a minimum term of 25 to 40 years and a maximum term of 60 years.  Id. § 769.25(9).

> Michigan simultaneously enacted Section 769.25a, which anticipated a United States or Michigan Supreme Court decision making Miller retroactively applicable. Mich. Comp. Laws § 769.25a(2). This provision applies to juveniles who were convicted of first-degree homicide offenses before Miller and who received mandatory sentences of life without parole. Id. Section 769.25a incorporates portions of Section 769.25 and relies on the same process for imposing renewed life-without-parole or term-of-years sentences. In January 2016, the Supreme Court held that Miller established a new substantive rule of constitutional law that applies

[2] Mich. Comp. Laws § 750.316 was amended to specifically except individuals covered by Mich. Comp. Laws §§ 769.25 and 796.25a, which cover youth offenders.

retroactively, <u>Montgomery v. Louisiana</u>, 136 S. Ct. 718, 736 (2016),
and thereby triggered implementation of Section 769.25a.

<u>Hill II</u>, 878 F.3d at 200.

According to Plaintiffs, there are 363 offenders who are subject to the resentencing
provisions of Section 769.25a. Michigan prosecutors have filed motions seeking the re-imposition
of sentences of life without parole for 236 of these individuals. To date, none of these
resentencings has taken place.[3] However, resentencing hearings are proceeding for those
individuals who were not the subject of motions for re-imposition of life-without-parole sentences.
Approximately one hundred individuals have been resentenced to a term of years; of these, over
thirty have been paroled and the remaining are parole eligible. Twenty-two individuals are still
awaiting resentencing for a term-of-years sentence. <u>See</u> Pl. Mot. at 4 (Dkt. 181).

Plaintiffs filed their second amended complaint in June 2016, naming Governor Rick
Snyder; Heidi E. Washington, Director of the Michigan Department of Corrections ("MDOC");
Michael Eagen, Chair of the Michigan Parole Board; and Bill Schuette, Michigan Attorney
General, as defendants (Dkt. 130). The second amended complaint asserts several claims, only
three of which remain in the case, following the Sixth Circuit's second opinion, reversing in part
and affirming in part Judge O'Meara's grant of Defendants' motion to dismiss. <u>Hill II</u>, 878 F.3d
at 215. The remaining claims are: Count IV (alleging that those facing a term-of-years sentence
with a mandatory maximum of sixty years are subjected to the equivalent of life imprisonment, in

---

[3] As the Sixth Circuit has observed, "two cases pending before the Michigan Supreme Court have
delayed . . . <u>Miller</u> hearings. <u>See</u> <u>People v. Skinner</u>, 889 N.W. 2d 487 (Mich. 2017) (mem.); <u>People
v. Hyatt</u>, 889 N.W. 2d 487 (Mich. 2017) (mem.). <u>Skinner</u> and <u>Hyatt</u> address the amended statutory
provisions that authorize judges – not juries – to make factual findings regarding the <u>Miller</u> factors
when sentencing juvenile offenders to life without parole. . . . Accordingly, this group of roughly
250 class members must await resolution of <u>Skinner</u> and <u>Hyatt</u> before they may receive a new
<u>Miller</u>-compliant sentence under Sections 769.25 and 769.25a." <u>Hill II</u>, 878 F.3d at 202-203. Oral
argument was heard on October 12, 2017; to date, the Michigan Supreme Court has not issued a
decision.

violation of the Eight and Fourteenth Amendments); Count V (alleging that Mich. Comp. Laws § 769.25a(6) retroactively deprives them of earned good time and/or disciplinary credits, in violation of the constitutional guarantee against ex post facto laws); and Count VI (alleging denial of rehabilitative programming necessary for release on parole deprives Plaintiffs of a "fair and meaningful opportunity for release," in violation of the Eighth and Fourteenth Amendments). These remaining claims were remanded for "expeditious resolution." Hill II, 878 F.3d at 215.

Plaintiffs promptly filed a motion for partial summary judgment on Counts V and VI of the second amended complaint (Dkt. 181), as well as a motion for class certification (Dkt. 180). Defendants filed a response containing a cross-motion for partial summary judgment on those same counts (Dkt. 190).

## II. STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts," <u>Scott</u>, 550 U.S. at 380 (quoting <u>Matsushita</u>, 475 U.S. at 586), as the "mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," <u>id.</u> (quoting <u>Anderson</u>, 477 U.S. at 247-248) (emphasis in original); <u>see also</u> <u>Babcock & Wilcox Co. v. Cormetech, Inc.</u>, 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### III.    ANALYSIS

#### A.    Abstention

Before addressing the merits of Plaintiffs' claim on Count V, the Court will address Defendants' argument that the Court should abstain from deciding the claim.  In Count V, Plaintiffs challenge Mich. Comp. Laws § 769.25a(6), which provides that individuals resentenced under Michigan's post-<u>Miller</u> sentencing scheme "shall not receive any good time credits, special good time credits, disciplinary credits, or any other credits that reduce the defendant's minimum or maximum sentence."  Plaintiffs allege that this statute retroactively deprives them of earned good time and disciplinary credits in violation of the Ex Post Facto Clause of the U.S. Constitution. Defendants contend that Plaintiffs never earned good time or disciplinary credits to begin with, and thus there has been no retroactive deprivation.  The crux of Plaintiffs' claim, therefore, hinges on an interpretation of the good time and disciplinary credit statutes, and whether these statutes previously afforded credit to individuals who were sentenced to life without parole.

Defendants argue that because the constitutional issue turns on an issue of state law, this Court should leave both the constitutional and state law issues for decision by the state courts. They base their abstention arguments on <u>Railroad Comm'n of Tex. v. Pullman Co.</u>, 312 U.S. 496 (1941), and <u>Younger v. Harris</u>, 401 U.S. 37 (1971), and also argue that the Court should decline

to exercise its declaratory judgment jurisdiction. The Court finds each of these arguments without merit.

### i. <u>Pullman</u> Abstention and Certification to the Michigan Supreme Court

"Where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions." <u>Brown v. Tidwell</u>, 169 F.3d 330, 332 (6th Cir. 1999) (quotations and alterations omitted). "This doctrine of abstention, known as the <u>Pullman</u> doctrine, acknowledges that federal courts should avoid the unnecessary resolution of federal constitutional issues and that state courts provide the authoritative adjudication of questions of state law." <u>Id.</u> A federal court should decline to exercise jurisdiction where uncertain state law might fairly be interpreted to avoid constitutional determinations, so as to honor important principles of federalism and avoid premature resolution of constitutional issues. <u>Harman v. Forssenius</u>, 380 U.S. 528, 534-535 (1965). "But the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary. Rather, we have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." <u>Hawaii Housing Auth. v. Midkiff</u>, 467 U.S. 229, 237 (1984) (internal quotations and alterations omitted).

Defendants argue that Michigan law on whether credits were earned by individuals convicted of first-degree murder is clear and favors Defendants' position; but if it is unclear, they say that state courts should resolve the ambiguity and potentially obviate the necessity of resolving the federal constitutional question. Def. Resp. at 11-12 (Dkt. 190). The Court disagrees. For the reasons set forth <u>infra</u> in section III.B., the Court concludes that state law regarding good time and disciplinary credits is unmistakably clear and solidly supports Plaintiffs' position. Before modification by the Michigan legislature in 2014, Michigan law regarding good time and

disciplinary credits made no distinction based on whether the prisoner was serving a life sentence and allowed such a prisoner to earn credit if otherwise eligible.

Defendants' position founders on other grounds. Abstention is inadvisable if it carries too high a risk that constitutional guarantees will go unenforced. The Supreme Court has warned that "because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention must be invoked only in special circumstances, and only upon careful consideration of the facts of each case." Harris Cty. Comm'rs Ct. v. Moore, 420 U.S. 77, 83 (1975) (internal citations and quotations omitted).

Defendants argue that there would be no undue delay if this Court abstained, because of the pendency of two cases currently before the Michigan Court of Appeals: People v. Wiley, No. 336898, and People v. Rucker, No. 338870. The appellants in these cases were resentenced pursuant to Mich. Comp. Laws § 769.25a in 2016 and 2017, respectively, and now have appealed their new sentences. Defendants claim that these cases would provide an avenue for the state courts to promptly address the issue of whether Plaintiffs earned credits during their prior sentences. Def. Cross-Reply at 7 (Dkt. 195).

However, it is not clear whether the court of appeals would decide to address this question. As Plaintiffs point out, the prosecutor argued in both cases that the court of appeals should not consider the question of whether Wiley or Rucker earned disciplinary credits. See Prosecutor Brief in People v. Wiley, Ex. A to Pl. Mot. for Leave to File Supplement, at 6-10 (Dkt. 199-2); Prosecutor Brief in People v. Rucker, Ex. B. to Pl. Mot. for Leave to File Supplement, at 8-10 (Dkt. 199-3) ("[I]t seems that defendant's challenge would be better directed in a suit against the Department of Corrections and not in an appeal of his validly imposed sentence.").

Even if the court of appeals did decide to address the question, there is every indication that Defendants will not follow its dictates in cases involving other class members unless and until there is a definitive ruling by the Michigan Supreme Court.[4] Thus, only <u>if</u> the court of appeals addresses the credit issue, and only <u>if</u> the Michigan Supreme Court decides to grant leave to appeal in those cases, and only <u>if</u> the Michigan Supreme Court actually decides the issue will there be a definitive statement on Michigan law as to the credit issue. Needless to say, there is no guarantee that any, much less all, of those contingencies will be realized. And even so, it may take many months, if not years, for that process to become final. Furthermore, <u>Wiley</u> and <u>Rucker</u> only involve disciplinary credits; thus the good time credit issue, which involves a separate statute, will not be addressed by those cases at all. This is hardly a prompt avenue for the definitive determination of state law that would be applicable in our case.

"The doctrine of abstention is equitable in its origins," <u>Hostetter v. Idlewild Bon Voyage Liquor Corp.</u>, 377 U.S. 324, 328 (1964), and it would be inequitable to require Plaintiffs – some of whom, if they prevail, would be immediately eligible for parole consideration – to wait even longer to seek resolution of their claims, particularly where the interpretation of the good time and disciplinary credits statute is clear. "[W]here the litigation has already been long delayed . . . abstention should not be required." <u>Moore</u>, 420 U.S. at 84; <u>see also</u> <u>West v. Village of Morrisville</u>, 728 F.2d 130, 135 (2d Cir. 1984) (describing "inordinate delay or inconvenience" as "one of the major drawbacks in invoking the abstention doctrine"); <u>Bickham v. Lashof</u>, 620 F.2d 1238, 1245

---

[4] The Sixth Circuit instructed this Court in its first remand to consider whether class certification "may indeed be necessary and appropriate in this case, particularly in light of defendants' apparent history of refusing to apply the court's orders to anyone other than the named plaintiffs." <u>Hill I</u>, 821 F.3d at 771. At the hearing on the current motions, Defendants' counsel stated that, regardless of the Michigan Court of Appeals' decision in <u>Rucker</u> and <u>Wiley</u>, "definitive resolution" of the state law issue would have to await a decision by the Michigan Supreme Court.

(7th Cir. 1980) ("[W]e are mindful that abstention is rooted in equity. Thus, we cannot overlook the delays that have occurred in plaintiff's case . . . or the nature of the injury alleged to occur as long as the Act remains in force."). Compelling Plaintiffs to languish in prison while an uncertain and lengthy state court process plays out – with no assurance of a definitive answer at the end of that journey – is the antithesis of the equitable principles enshrined in the abstention doctrine.

Alternatively, Defendants argue that the Court should certify the question of whether Plaintiffs earned any credits to the Michigan Supreme Court. Def. Resp. at 12-13. "Certification today covers territory once dominated by . . . Pullman abstention," and "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court[.]" Arizonans for Official English v. Arizona, 520 U.S. 43, 75-76 (1997).

Certification of this question to the Michigan Supreme Court would be inappropriate for the same reason Pullman abstention is unwarranted – the delay involved in such a process. The Sixth Circuit has noted that federal courts "will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves." Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009) (quoting Pino v. United States, 507 F.3d 1233, 1236 (10th Cir. 2007)); see also City of Houston, Tex. v. Hill, 482 U.S. 451, 470-471 (1987) ("[T]he availability of certification is not in itself sufficient to render abstention appropriate. It would be manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim.") (internal citations omitted); State Auto Prop. & Cas. Ins. Co. v. Hargis, 785 F.3d 189, 194 (6th Cir. 2015) ("The state court need not have addressed the exact question, so long as well-established principles exist to govern a decision."). Finally, as Plaintiffs note, the Eastern District of Michigan's Local Rule regarding

certification requires written findings by the court that "certification of the issue will not cause undue delay or prejudice." L.R. 83.40(a)(3). This Court cannot make such a finding.

Accordingly, this Court will not decline to exercise its jurisdiction under Pullman, nor certify this issue to the Michigan Supreme Court.

### ii. <u>Younger</u> Abstention

Defendants argue that this Court should abstain from deciding the issue based on the principles of federalism and comity set forth in <u>Younger v. Harris</u>, 401 U.S. 37 (1971). "The <u>Younger</u> abstention doctrine counsels a federal court to refrain from adjudicating a matter that is properly before it in deference of ongoing state criminal proceedings." <u>Executive Arts Studio, Inc. v. City of Grand Rapids</u>, 391 F.3d 783, 791 (6th Cir. 2004). The doctrine has been expanded to include "certain civil enforcement proceedings and civil proceedings uniquely involving the ability of state courts to perform their judicial functions, such as civil contempt order or appellate bond requirements." <u>Id.</u> <u>Younger</u> applies where: "(1) state proceedings are pending; (2) the state proceedings involve an important state interest; and (3) the state proceedings will afford the plaintiff an adequate opportunity to raise his constitutional claims." <u>Kelm v. Hyatt</u>, 44 F.3d 415, 419 (6th Cir. 1995). However, <u>Younger</u> abstention is the exception, not the rule, when a federal court must decide whether to exercise jurisdiction. See <u>Hill II</u>, 878 F.3d at 205 ("Federal courts are to treat <u>Younger</u> as a limited carve-out to federal courts' virtually unflagging obligation to exercise their jurisdiction.") (internal quotation marks omitted).

Defendants argue that there are currently ongoing state judicial proceedings regarding this same issue – <u>Rucker</u> and <u>Wiley</u>. In addition, they point to "[t]he putative class members' state criminal proceedings [which] were reopened for resentencing when prosecutors notified the state trial courts in March 2016 which prisoners were subject to resentencing under Mich. Comp. Laws

§ 769.25a." Def. Resp. at 17. Therefore, they argue, at least two putative class members have raised this ex post facto claim in state courts, and there may be more who have done so.

However, the "threshold issue in any <u>Younger</u> analysis is the 'question of whether interference exists.'" <u>Merck Sharp & Dohme Corp. v. Conway</u>, 909 F. Supp. 2d 781, 784 (E.D. Ky. 2012) (quoting <u>Mass. Delivery Ass'n v. Coakley</u>, 671 F.3d 33, 40 (1st Cir. 2012)). "In the typical <u>Younger</u> case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings." <u>Devlin v. Kalm</u>, 594 F.3d 893, 894 (6th Cir. 2010) (quoting <u>Crawley v. Hamilton Cty. Cmm'rs</u>, 744 F.2d 28, 30 (6th Cir. 1984)).

Here, <u>Younger</u> abstention is not appropriate, because Plaintiffs are not seeking to interfere with, or enjoin, any ongoing judicial proceedings. Michigan courts do not typically play any role in determining good time and disciplinary credits to which a defendant may be entitled. Rather, the Michigan court rules require the sentencing court to state only the time served by the defendant. <u>See</u> Mich. Ct. R. 6.425(E)(1)(d) ("The court must . . . state the sentence being imposed, including the minimum and maximum sentence if applicable, together with any credit for time served to which the defendant is entitled . . . ."). It is the MDOC that regularly calculates good time and disciplinary credits to determine eligibility for parole. <u>See</u> Richard Stapleton Aff., Ex. 5 to Pl. Mot., ¶¶ 10, 14 (Dkt. 181-6). And MDOC has done this historically when a prisoner serving a life sentence has been resentenced to a term of years. <u>Id.</u> ¶ 9. Thus, the relief this Court now orders will not present any interference with the state courts, within the meaning of <u>Younger</u>.

The kind of interference that would raise a <u>Younger</u> concern is on-going intrusion in a state adjudication process. <u>See, e.g.</u>, <u>Shafizadeh v. Bowles</u>, 476 Fed. App'x 71, 73 (6th Cir. 2012) (<u>Younger</u> abstention applicable where the plaintiff sought "an injunction to direct the judge who

presided over the divorce to remove himself from the case" and "declarations that the rules or practices applied in his case are invalid"); <u>J.P. v. DeSanti</u>, 653 F.2d 1080, 1085 (6th Cir. 1981) (finding interference with a state proceedings where plaintiffs sought to prevent the use of "social histories" during juvenile court proceedings); <u>Parker v. Turner</u>, 626 F.2d 1, 4, 8 (6th Cir. 1980) (finding <u>Younger</u> abstention appropriate where plaintiffs sought "a declaratory judgment that certain allegedly widespread practices in the juvenile court are unconstitutional," as this "would necessarily require monitoring of the manner in which the state juvenile judges conducted contempt hearings in non-support cases").

The absence of any on-going interference in state court proceedings by this Court in granting the relief Plaintiffs request makes our case like <u>Dwayne B. v. Granholm</u>, No. 06-13548, 2007 WL 1140920 (E.D. Mich. Apr. 17, 2007), where the court found <u>Younger</u> abstention inapplicable – a case seeking class-wide declaratory and injunctive relief to remedy the "[m]yriad systemic failings" of Michigan's foster care system. The court reasoned that while "there may be some ongoing juvenile court proceedings for individual foster care children [in the plaintiffs' class], this lawsuit does not seek to interfere with any such proceedings. The relief sought here is not directed at the juvenile courts. It is directed at the executive branch." <u>Id.</u> at *6.

Similarly here, Plaintiffs are correct in arguing that the relief they seek is "directed at the Michigan Department of Corrections and the Parole Board, not the state-court resentencing process." Pl. Reply at 12 (Dkt. 193). They properly note that the resentencing courts will only decide a prisoner's minimum and maximum term, and that any application of good time or disciplinary credits "is an administrative and executive function outside the purview of state judicial proceedings[.]" <u>Id.</u>

This Court's ruling on the unconstitutionality of revoking credits will present no on-going intrusion into state adjudication, as it "will not require ongoing federal court oversight or interference with the daily operation of Michigan's . . . courts." Dwayne B., 2007 WL 1140920, at *7.

Therefore, Younger abstention is not warranted.

### iii.  Discretion

Defendants also request that the Court decline to exercise its declaratory judgment jurisdiction over the claim.  Def. Resp. at 17.  In considering whether to exercise jurisdiction, courts consider five factors:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

Grand Trunk Western R. Co. v. Consol. Rail Corp., 746 F.2d 323, 326 (6th Cir. 1984).

The Court finds that these factors weigh in favor of exercising its jurisdiction.  This Court can issue a declaratory ruling that would affect the rights of all individuals who were previously sentenced to mandatory life imprisonment for homicide offenses committed as juveniles; this would serve the useful purpose of resolving a dispute involving hundreds of prisoners and do so conclusively.  There is no state proceeding available that would be nearly as timely or effective. Indeed, Defendants represented at oral argument that, if Rucker or Wiley were to prevail before the Michigan Court of Appeals, only a decision by the Michigan Supreme Court would definitively decide the issue for all others similarly situated.  Additionally, because Plaintiffs did not file their ex post facto claim in response to any litigation filed by Defendants, the declaratory remedy can

hardly be characterized as "procedural fencing" or a "race for res judicata." See id. (describing procedural fencing as "an attempt to have the federal courts do what the state court has already refused to do").   And for the reasons discussed above, this Court's enforcement of federal constitutional guarantees will not involve any encroachment on state jurisdiction or trigger friction with state courts.   For all these reasons, the Court will not decline to exercise its declaratory judgment jurisdiction.

### B.    Count V – Ex Post Facto Violation

The Court now turns to the merits of Plaintiffs' claim on Count V.   Plaintiffs allege that Mich. Comp. Laws § 769.25a(6),[5] which provides that individuals resentenced under Section 25a shall not receive any good time or disciplinary credits, violates the Ex Post Facto Clause of the Constitution.   Pl. Mot. at 8.[6]

The Ex Post Facto Clause prohibits any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed."   Weaver v. Graham, 450 U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 71 U.S. 277, 325-326 (1866)).   "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated."   Id. at 30.

---

[5] "A defendant who is resentenced under subsection (4) shall be given credit for time already served, but shall not receive any good time credits, special good time credits, disciplinary credits, or any other credits that reduce the defendant's minimum or maximum sentence." Mich. Comp. Laws § 769.25a(6).

[6] The Ex Post Facto Clause provides: "No State shall . . . pass any . . . ex post facto Law . . . ." U.S. Const. art. I, § 10, cl. 1.

Good time and disciplinary credits are applied to a prisoner's minimum and/or maximum sentence in order to determine his or her parole eligibility dates.[7] Thus, if Michigan's statutory scheme permitted any Plaintiff to earn good time or disciplinary credits at the time the Plaintiff's crime was committed, the removal of such credits increases the Plaintiff's punishment and violates the Ex Post Facto Clause.

As addressed below, the language of the relevant statutes, the case law, and the practices of the MDOC amply demonstrate that Plaintiffs were entitled to earn good time and/or disciplinary credits while serving their life sentences. Thus, the elimination of these earned credits by Mich. Comp. Laws § 769.25a(6) violates the Ex Post Facto Clause.

### i. Statutory Interpretation

Michigan's statutory scheme regarding good time and disciplinary credits has changed over the years. Prior to 1978, prisoners could apply good time credits to both their minimum and maximum terms; the law was amended in 1978 to provide that prisoners convicted for certain crimes, including first and second-degree murder, could only apply good time credits to their maximum terms. See Wayne Cty. Prosecuting Atty. v. Mich. Dep't of Corrections, No. 186106, 1997 WL 33345050, at *2 (Mich. Ct. App. June 17, 1997). In 1987, good time credits were eliminated altogether for offenses committed on or after April 1, 1987. Id.

Disciplinary credits were created in 1982, and were deducted from both the minimum and maximum sentences of prisoners convicted of certain crimes, including first and second-degree murder. See Mich. Comp. Laws § 800.33(5). Disciplinary credits were less favorable to prisoners than good time credits, as the amount of good time credits available to a prisoner increased with

_____

[7] As the Sixth Circuit noted in Hill II, "[C]redits deducted from a term-of-years sentence do not automatically result in earlier release; they merely hasten the date on which prisoners fall within the jurisdiction of the Michigan Parole Board. Even after an inmate falls within its jurisdiction, the Board retains discretion to grant or deny parole." Hill II, 878 F.3d at 210.

each year of imprisonment, while disciplinary credits remained constant over the entirety of the term to which they applied.  See Lowe v. Dep't of Corrections, 521 N.W. 2d 336, 338 (Mich. Ct. App. 1994).  The law changed again in 1998 to provide that prisoners who committed certain crimes, including first and second-degree murder, on or after December 15, 1998, or any other crime on or after December 15, 2000, are unable to earn disciplinary credits.  See Mich. Comp. Laws §§ 800.33(14) and 800.34(5); see also Stapleton Aff., ¶ 7.

The broad language used in both the good time and the disciplinary credit statutes does not draw any distinction based on whether the prisoner is serving a life sentence.  The good time credit statute provides as follows:

> (2) Except as otherwise provided in this section, a prisoner who is serving a sentence for a crime committed before April 1, 1987, and who has not been found guilty of a major misconduct or had a violation of the laws of this state recorded against him or her shall receive a reduction from his or her sentence as follows:
>
> (a) During the first and second years of his or her sentence, 5 days for each month.
>
> (b) During the third and fourth years, 6 days for each month.
>
> [ . . .]
>
> (g) From and including the twentieth year, up to and including the period fixed for the expiration of the sentence, 15 days for each month.

Mich. Comp. Laws § 800.33(2).  The statute providing for disciplinary credit provides,

> (3) . . . [A]ll prisoners serving a sentence for a crime that was committed on or after April 1, 1987 are eligible to earn disciplinary and special disciplinary credits as provided in subsection (5). Disciplinary credits shall be earned, forfeited, and restored as provided in this section.  Accumulated disciplinary credits shall be deducted from a prisoner's minimum and maximum sentence in order to determine his or her parole eligibility date and discharge date.
>
> [ . . .]

> (5) . . . [A]ll prisoners serving a sentence on December 30, 1982, or incarcerated after December 30, 1982, for the conviction of a crime enumerated in section 33b(a) to (cc) of 1953 PA 232, MCL 791.233b, are eligible to earn a disciplinary credit of 5 days per month for each month served after December 30, 1982. Accumulated disciplinary credits shall be deducted from a prisoner's minimum and maximum sentence in order to determine his or her parole eligibility dates.

Mich. Comp. Laws § 800.33(3), (5).

Nothing in the text of the good time credit or disciplinary credit statutes excludes their application to prisoners serving life sentences. In fact, both statutes use language that is all encompassing. See Mich. Comp. Laws § 800.33(2) ("[A] prisoner who is serving a sentence for a crime . . ."); Mich. Comp. Laws § 800.33(5) ("[A]ll prisoners serving a sentence . . ."). Further, the disciplinary credit statute states explicitly that first-degree murderers earn disciplinary credit; it provides that disciplinary credits are earned by those convicted of a crime enumerated in Mich. Comp. Laws § 791.233b – which includes first-degree murder. See § 791.233b(n) (listing Section 316 of the Michigan penal code as one of the enumerated crimes); § 750.316 (first degree murder).[8]

Despite this unambiguous language, Defendants argue there is some shade of gray. They point out that the good time statute indicates that a prisoner "shall receive a reduction" from his or her sentence, up to and including the "period fixed for the expiration of the sentence." Mich. Comp. Laws § 800.33(2). They argue that prisoners serving a life sentence cannot have that sentence "reduced," and that there is no time "fixed" for the "expiration" of such sentence; therefore, they say, this statute cannot be applied to prisoners serving a life term. Def. Resp. at 4.

---

[8] Whatever exceptions to credit that exist in the statutes have nothing to do with whether the defendant committed first-degree murder. For example, the good time credit statute excepts those who have committed later crimes or were guilty of prison misconduct. See Mich. Comp. Laws § 800.33(2).

This argument is unconvincing. The language may mean that the good time credits are not actually <u>applied</u> to a life sentence so long as it remains a life sentence. But there is no reason to think that a prisoner serving a life sentence could not, nonetheless, <u>earn</u> good time credits. They would be applied if and when the sentence was converted, for some reason, to a fixed sentence. Once changed to a term of years, there is an "expiration" that is "fixed," and the sentence can then be "reduced." In fact, this view of the statutory language is precisely the view of the MDOC, whose practice has routinely been to calculate credits when a prisoner previously serving a life sentence is subsequently resentenced to a term of years. See infra section III.B.iii.

As for the disciplinary credit statute, Defendants have no explanation for the explicit inclusion of first-degree murder as one of the crimes for which credits could be earned. They maintain that the language in other parts of the statute, which references deductions from a minimum and maximum sentence, means that the statute cannot apply to those serving a life sentence, as such prisoners have no minimum or maximum term. Def. Resp. at 4-5. But again, a plausible interpretation of the statute – and one that renders the statute as a whole internally consistent – is that the disciplinary credits are not <u>applied</u> to a life sentence, although prisoners serving such term still <u>earn</u> them. To agree with Defendants would be to ignore a portion of the statute, and courts have a "duty to give effect, if possible, to every clause and word of a statute." Duncan v. Walker, 533 U.S. 167, 174 (2001) (internal quotations omitted); see also Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing this rule as "a cardinal principle of statutory construction").

The lack of any ambiguity in the statutory language is, perhaps, best evidenced by the action of the Michigan legislature itself, in adopting Mich. Comp. Laws § 769.25a(6). If the legislature had believed that Michigan law did not provide credits to those convicted of first-degree

murder, there would have been no purpose for a provision that expressly stripped them of those credits. The inference is ineluctable that the legislature understood that these individuals would invoke these credits unless the legislature affirmatively repealed them. In doing so, the legislature eloquently testified to the state of Michigan law prior to the adoption of Section 769.25a(6).

### ii.  Michigan Case Law

The Michigan Supreme Court is in accord with the view that good time credit is earned even by individuals serving life sentences. In <u>Moore v. Buchko</u>, 154 N.W.2d 437 (Mich. 1967), the Michigan Supreme Court considered whether a prisoner who had been unconstitutionally sentenced to life imprisonment in 1938 for first-degree murder should receive credit, including good time credit, when he was resentenced following vacation of his conviction, retrial, and conviction for second-degree murder in 1958. Although no opinion received a majority of votes, all the Justices agreed that the prisoner was entitled to good time credit for the time he had served. Justice Souris's opinion, which was joined by Chief Justice Dethmers, concluded that the prisoner was "entitled by statute to the credit he seeks," which was "the nearly 20 calendar years he served under his invalidated conviction . . . and the regular and special good time credit he earned during that time." <u>Id.</u> at 438, 441 (Souris, J.). Justice Adams, writing for three other justices, wrote that a sentencing judge "shall give credit for time served under an illegal sentence," and that "[i]t follows, A [sic] fortiori, that such credit includes recognition of regular or special good time earned during an illegal incarceration." <u>Id.</u> at 445 n.3 (Adams, J.).

Justice Brennan addressed the issue of whether the prisoner had earned good time credits in much greater detail, ultimately concluding that "the good time statute purports to give good time credits to every convict who behaves himself in prison." <u>Id.</u> at 447 (Brennan, J.). He described the rationale behind allowing all prisoners, even those serving a life term, to earn credits:

> Clearly, the purpose of this enactment is to encourage good behavior by prisoners and thus generally to improve conditions in the prisons and reduce custodial costs to the taxpayers.
>
> Presumably, the statute makes no distinction between lifers and other convicts by reason of the fact that the legislature wanted to encourage good behavior by lifers as well as by all other prisoners.
>
> Admittedly, the good time credit incentive is rather nebulous in the case of a convict imprisoned for life. But since hope and post conviction pleas spring eternal within the incarcerated human breast, it cannot be said the good time credit law is not at least some encouragement to them. At least, it appears that the legislature thought it would be so, and its policy determination is binding on this Court.

Id. Thus, seven of the eight justices joined an opinion that held that the prisoner was entitled to good time credit.[9]

Defendants attempt to distinguish Moore by arguing that Moore was resentenced to a term of years under law that existed at the time of his crime in 1938. Def. Resp. at 6-7. Plaintiffs' new sentencing options, they contend, did not exist until 2014. Id. at 7, 9. However, Defendants have not explained why this should make a difference. Nothing in Moore suggests that the availability of a term-of-years sentence while Moore served his first-imposed sentence had some bearing on the question of his entitlement to credit. Additionally, Defendants' position that Plaintiffs should not receive credit because Michigan law did not provide a constitutional sentence for them until 2014 would punish Plaintiffs for the shortcomings of Michigan's unconstitutional sentencing of youth offenders.

Defendants argue that the Michigan Supreme Court recognized that the good time statute does not apply to someone serving a life sentence in Meyers v. Jackson, 224 N.W. 356 (Mich. 1929). In Meyers, the petitioner was convicted of murder and sentenced to life in prison; the

---

[9] Justice Black concurred only in the result and did not join any opinion.

governor later commuted his sentence "so that the same will expire 15 years from the date of sentence." Id. at 356. The court denied the petitioner's request for good time credit, stating that "if he accepts the benefit of the commutation granted[, he] must accept it in accordance with the terms imposed by the executive authority granting it." Id. at 356-357. The court also noted that "the question of good time applies only to those where the date of expiration of sentence is fixed. Petitioner was sentenced to imprisonment for life. The period of his imprisonment was not fixed." Id. at 356.

This last statement is dictum, as it was not necessary to the Meyers court's holding that a prisoner who accepts a commutation must accept it according to its terms. See Moore, 154 N.W.2d at 447 (Brennan, J.) ("[T]he language in the Meyers Case to the effect that good time allowances do not apply to life sentences was not essential to the decision there."); see also Petition of Cammarata, 67 N.W.2d 677, 682 (Mich. 1954) ("In Meyers . . . we held that a prisoner who accepts the benefit of a commutation must accept it in accordance with the terms imposed by the executive authority granting it.").

Thus, the only decision by the Michigan Supreme Court containing a holding applicable to our case accords with the view that credits are earned by those convicted of first-degree murder and applied to their sentences once those sentences become term-of-years sentences. The holding of a state's highest court on a matter of state law is entitled to respect and ordinarily should be followed. Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999) ("In construing questions of state law, the federal court must apply state law in accordance with the controlling decisions of the highest court of the state.").[10]

_____

[10] Defendants cite People v. Tyrpin, 710 N.W. 2d 260 (Mich. Ct. App. 2005), for support, but that case is distinguishable. There, the defendant was originally given a determinate one-year jail sentence. After serving some time, the sentence was reversed, based on the prosecutor's appeal

### iii. MDOC Practice

Further evidence of the state of Michigan law is MDOC's long-standing policy to calculate and award credits for those serving life sentences. Plaintiffs have provided an affidavit from Richard Stapleton, the former Administrator of the MDOC Office of Legal Affairs, who spent thirty-four years at MDOC. Stapleton averred that when a prisoner was originally serving a life sentence and was then resentenced to a term-of-years sentence, it was "routine and regular practice for the department's records office staff to compute a prisoner's new sentence by applying the time already served and by awarding good time or disciplinary credits in accordance with MCL 800.33 to the new terms of years' sentence." Stapleton Aff. ¶ 9 (emphasis added).[11]

Defendants do not dispute that this is MDOC's practice. Def. Cross-Reply at 3. Instead, they argue that MDOC regularly calculates credits "when lifers have been resentenced for a different offense or to a new sentence for the same offense under existing law that permitted credits for the new term of years," which, they say, is not the case here. Id. (emphases in original). It is not clear why this distinction should matter, and Defendants offer no explanation. What is

---

that an indeterminate sentence was required. Defendant argued on resentencing that he should receive disciplinary credit that he earned on the initial improper sentence. The court of appeals affirmed the trial court's refusal to award any disciplinary credit, reasoning that if the defendant had been properly sentenced to an indeterminate sentence originally, he would not have been entitled to such credit based on an express exclusion in the statutory language. (This was because, as discussed supra, individuals sentenced for assaultive crimes committed on or after December 15, 1998 were not eligible for disciplinary credits.) Our case is entirely different. Tyrpin sought credit that he would not have received had he been sentenced properly initially. Here, Plaintiffs do not seek any credit they would not have received had they been sentenced properly initially. Tyrpin thus is no help to Defendants.

[11] Case law confirms the MDOC practice. Wayne Cty. Pros. Atty. v. Mich. Dep't of Corrections, No. 186106, 1997 WL 33345050 (Mich. Ct. App. June 17, 1997), involved a prisoner who was previously sentenced to life imprisonment and subsequently resentenced to a term of twenty to thirty years' imprisonment. The MDOC calculated the prisoner's good time credit "from the time that [he] was initially incarcerated," which was upheld by the court of appeals after being challenged by the Wayne County prosecutor.

important is that Stapleton's affidavit confirms that Michigan has historically recognized good time and disciplinary credit as being earned by those serving life sentences.[12]

For all of the above reasons, this Court interprets Mich. Comp. Laws § 800.33 to provide good time and disciplinary credits to prisoners who were serving a term of life imprisonment. The elimination of those credits by Mich. Comp. Laws § 769.25a(6), therefore, violates the Ex Post Facto Clause of the Constitution. Plaintiffs are entitled to summary judgment on Count V, and Defendants must apply good time and disciplinary credits in calculating parole eligibility dates for prisoners resentenced under Mich. Comp. Laws § 769.25a.[13]

### C.     Count VI – Rehabilitative Programming

Plaintiffs also seek summary judgment on Count VI, which alleges that they are deprived of a meaningful opportunity for release due to Defendants' failure to provide them with rehabilitative programming. Plaintiffs contend that the Michigan Parole Board examines whether an individual has completed rehabilitative programming when determining whether to grant parole, and often denies parole to prisoners who have not completed their recommended

---

[12] Defendants argue that even if Plaintiffs had earned the credits, there has been no constitutional violation because they were not disadvantaged in any way. They contend that it is a "common-sense intuition" that a prisoner who was sentenced to life without parole is not disadvantaged when she is resentenced to a term of years, as her sentence is indisputably reduced. Def. Resp. at 8; see also Def. Cross-Reply at 4-6. The Sixth Circuit rejected this argument in Hill II, recognizing that Plaintiffs are clearly disadvantaged by the elimination of credits that they earned while serving their life sentences. Plaintiff Jennifer Pruitt, for example, would become immediately eligible for parole if her credits were restored; without such credits, she will be ineligible for review by the Michigan Parole Board for several more years. Hill II, 878 F.3d at 213. Losing the opportunity to serve the lowest sentence possible under the law is an obvious disadvantage within the meaning of the ex post facto prohibition.

[13] Although the parties do not directly address prerequisites for permanent injunctive relief, a permanent injunction is appropriate to prevent the irreparable harm that stems from a denial of constitutional rights. See, e.g., Lee v. City of Columbus, Ohio, 636 F.3d 245, 249 (6th Cir. 2011) ("A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law."). That requirement is satisfied here.

programming.  Pl. Mot. at 16.  Plaintiffs allege that the 236 juvenile offenders who are the subject

of motions for life sentences are currently considered to be ineligible for parole, and thus are denied

access to rehabilitative programming.  <u>Id.</u>  They argue that by denying these prisoners

rehabilitative programming, Plaintiffs have no chance of being released on parole; accordingly,

Defendants are violating Plaintiffs' right to a meaningful opportunity for release, as outlined in

<u>Graham v. Florida</u>, 560 U.S. 48, 75 (2010) and <u>Miller</u>, 567 U.S. at 479.

Defendants respond that Plaintiffs have not shown that they are denied a meaningful

opportunity for release based on a denial of rehabilitative programming pending their

resentencings.  Def. Resp. at 19.  Plaintiffs are currently in a pre-sentencing posture, Defendants

argue, and once they receive their new sentences, those who are resentenced to a term of years will

be eligible for rehabilitative programming.  <u>Id.</u> at 21.  They argue that Plaintiffs have no right to

rehabilitative programming at this point; at any rate, the Michigan Parole Board has released 44 of

45 resentenced juvenile homicide offenders, and Plaintiffs therefore cannot show that they are in

fact being denied an opportunity for meaningful release.  <u>Id.</u> at 19-20.  Defendants state that the

parole board considers many factors in making its decisions, and successful completion of

programming plays only a "minimal role."  <u>Id.</u> at 20.

The Court will deny both motions for summary judgment on Count VI without prejudice

to allow further discovery to take place.  Because there has been no discovery, the summary

judgment record is very thin.  Plaintiffs point to an affidavit from 2013 stating that the "Parole

Board often denies release to prisoners who have not completed [recommended] programs,"

Richard Stapleton Aff., Ex. 3 to Pl. Supp. Br., ¶ 22 (Dkt. 67-4).  Defendants rely on the MDOC

Policy Directive 06.05.100, which sets forth several factors for the Parole Board to consider; they

also argue that 44 out of 45 juvenile homicide offenders have been released on parole.  Def. Resp.

at 19-20.  Given the lack of a fully developed record, the Court will deny summary judgment at this time.  Discovery is ongoing with respect to Count IV, and the Court believes that its decision on Count VI will benefit from additional information regarding the concerns and considerations of the Michigan Parole Board, particularly regarding the 45 individuals who went before the Board following their resentencings.

### D. Class Certification

Plaintiffs have moved for certification of a class of "all individuals in Michigan DOC custody who were convicted of first-degree murder for offenses committed when they were below 18 years of age, were or will be subjected to resentencing under M.C.L. § 769.25a, and are or could become eligible for parole."  Pl. Mot. for Class Cert. at 8 (Dkt. 180).  They also propose two subclasses: the first would consist of "all persons in the primary class whose offenses occurred prior to December 15, 1998," id., and the second would consist of "all persons in the primary class who are still awaiting resentencing," id. at 9.  The first subclass includes all individuals who seek relief under Count V, and the second subclass includes all individuals who seek relief under Count VI.

To obtain class certification, Plaintiffs must show the following four requirements are met:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig., 722 F.3d 838, 850 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(a)).  If these prerequisites are met, "the proposed class must also meet at least one of the three requirements listed in Rule 23(b)."  Id.  Here, Plaintiffs seek certification pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Court finds that Plaintiffs have satisfied these requirements.[14]

### i. Numerosity

The primary class and two proposed subclasses are sufficiently numerous to justify class certification. The proposed primary class consists of "over 50" individuals still incarcerated who are currently eligible for parole or will become parole eligible, and 250 individuals who are awaiting resentencing. Pl. Mot. at 5. The first subclass, which consists of individuals whose offenses occurred before December 15, 1998, exceeds 250. Id. at 5. The second subclass consists of over 250 individuals who are awaiting resentencing. Id. These groups are sufficiently numerous to satisfy the first requirement. See Davidson v. Henkel Corp., 302 F.R.D. 427, 436 (E.D. Mich. 2014) ("[I]t generally is accepted that a class of 40 or more members is sufficient to satisfy the numerosity requirement.").

Defendants had previously argued that for the first subclass, Plaintiffs were improperly including individuals who may be resentenced to life without parole; if they were sentenced to life without parole, they would not be affected by whether or not they obtained good time or disciplinary credits under Count V. Def. Resp. at 21 (Dkt. 188). However, Plaintiffs responded that there are fifty-one individuals who have already been resentenced and are being denied good

---

[14] Defendants argue that class certification should be denied, because Plaintiffs' claims are flawed on the merits, and ask that the Court defer consideration of a class until it decides the motions for summary judgment. Def. Resp. at 2. "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." In re Whirlpool, 722 F.3d at 851 (quoting Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 568 U.S. 455, 466 (2013)). Additionally, as partial summary judgment motions from both parties are presently before the Court, the Court declines to delay the issue of certification any longer. Defendants also argued that Younger precludes class certification, but as already discussed, Younger abstention is not appropriate in this case.

time or disciplinary credits; this alone satisfies the numerosity requirement. Pl. Reply at 3 (Dkt. 191). Defendants conceded at oral argument that the numerosity requirement would be met regardless of whether the individuals who have yet to be resentenced were included in the subclass. Additionally, even if a class member were resentenced to life without parole, he or she still continues to earn good time and/or disciplinary credit, which may eventually be applied if there is some future resentencing. Individuals whose offenses occurred prior to December 15, 1998 and who have yet to be resentenced are, therefore, appropriately considered as part of the first subclass.

Defendants also argued that Plaintiffs improperly included individuals awaiting resentencing in the second proposed subclass who may ultimately be resentenced to life without parole. Def. Resp. at 21. However, Plaintiffs alleged that the denial of rehabilitative programming "imperils their ability to demonstrate rehabilitation in the context of the <u>Miller</u> resentencing hearings themselves," Pl. Mot. for Summ. J. at 20 n. 11, and thus this alleged denial of programming would affect the entire subclass regardless of the type of sentence they receive.

### ii. Commonality

Next, the Plaintiffs must show that the requirement of commonality is met for all the proposed class and subclasses. "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury." <u>In re Whirlpool Corp.</u>, 722 F.3d at 852. The plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." <u>Id.</u> Commonality depends on "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011).

"Commonality under Rule 23(a)(2) is met where, notwithstanding some factual differences, the class action claims are based on a common course of conduct of misrepresentations, omissions, or other wrongdoing affecting all class members in the same manner." <u>Yadlosky v. Grant Thorton, L.L.P.</u>, 197 F.R.D. 292, 298 (E.D. Mich. 2000) (quotation marks omitted).

Here, resolution of each of Plaintiffs' claims will resolve the issue for the entire class or subclass; that is, resolution of Count IV will resolve the claim for the entire class; resolution of Count V will resolve the claim for the entire first subclass; and resolution of Count VI will resolve the claim for the entire second subclass. The challenged statute or MDOC policy affects all class members in the same manner. Defendants' argument that "individual questions will overwhelm any common questions" with respect to the second proposed subclass is not persuasive, because "the commonality standard requires only that a putative class share either the injury or the immediate threat of being subject to the injury." <u>Baby Neal for and by Kanter v. Casey</u>, 43 F.3d 48, 60-61 (3d Cir. 1994) (commonality requirement met where "systemwide deficiencies either violate class members' rights currently or subject them to the risk of such a violation."). Regardless of individual factors regarding a prisoner's likelihood of parole, the entire second subclass shares the allegedly unconstitutional denial of rehabilitative programming.

### iii. Typicality

To demonstrate typicality, Petitioners must demonstrate that "the class members' claims are fairly encompassed by the named plaintiffs' claims." <u>In re Whirlpool</u>, 722 F.3d at 852 (quotation marks omitted). The typicality requirement ensures that "the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." <u>Id.</u> at 852-853. "[C]ommonality and typicality tend to merge in practice because both of them serve as

guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Id. at 853 (quotation marks omitted).

The claims of the proposed class representatives – Matthew Bentley, Giovanni Casper, Jennifer Pruitt, Bosie Smith, Dontez Tillman, Damion Todd, Jean Cintron, Keith Maxey, Kevin Boyd, Jemal Tipton, and Nicole Dupure – are typical of the claims of the class, because all of the individuals named as proposed class representatives were or will be subjected to resentencing under Mich. Comp. Laws § 769.25a, and are or could become eligible for parole. They all have the same interest as the class members in the resolution of Count IV. Further, all of the proposed subclass representatives for the first subclass – Bentley, Pruitt, Smith, Todd, Boyd, and Tipton – committed crimes before December 1998, such that they have the same interest as the subclass members in seeking relief on Count V. And finally, the proposed subclass representatives for the second subclass – Maxey, Cintron, Tipton, Boyd, and Dupure – are currently awaiting resentencing, such that they have the same interest as the subclass members in obtaining access to rehabilitative programming under Count VI.

Defendants argue that Boyd, Dupure, and Tipton are not proper class representatives, because they may be resentenced to life without parole, such that their claims would be rendered moot. Def. Resp. at 22. For Counts IV and V, there are enough proper class representatives who have been resentenced to a term of years such that it does not defeat class certification if these three individuals are not considered adequate representatives. For Count VI, as Plaintiffs point out and as discussed above, the entire claim is brought on behalf of individuals who await

resentencing, so the fact that they have not been resentenced would not disqualify Boyd, Dupure, or Tipton.

### iv. Adequacy

The final prerequisite of Rule 23(a) is whether the named Plaintiffs' representatives will fairly and adequately protect the interests of the class. The Sixth Circuit employs the following two-prong test to determine adequacy: (i) the class representatives must have common interests with the putative class members; and (ii) the representatives must "vigorously prosecute the interests of the class through qualified counsel." Vassalle v. Midland Funding LLC, 708 F.3d 747, 757 (6th Cir. 2013). Here, the proposed class representatives have common interests with the putative class members, as described above. Further, counsel for Plaintiffs have shown themselves to be qualified and to have vigorously pursued this case over the last seven years. This requirement is satisfied.

### v. Rule 23(b)(2)

The Court must determine whether certification pursuant to Rule 23(b)(2) is proper. The rule states that a class may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." Wal-Mart, 564 U.S. at 360 (quotation marks omitted).

Here, this requirement is satisfied as to the proposed class and both proposed subclasses. Defendants have refused to provide the relief requested to all Plaintiffs because of their membership in the class or subclass, not on individualized bases. "Because this suit challenges

conduct generally applicable to the class and because the court can enter appropriate declaratory and injunctive relief," the requirement of Rule 23(b)(2) is met. <u>Casey</u>, 43 F.3d at 64.

### vi. Class Counsel

Although the parties do not address this issue in their briefing, Federal Rule 23(g)(1) states that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Courts must consider the counsel's identification or investigation of potential claims, counsel's relevant experience, knowledge of relevant law, and the resources counsel will commit to representation. Fed. R. Civ. P. 23(g)(1)(A). The Court finds that Deborah LaBelle is an experienced litigator who has diligently represented Plaintiffs for the past seven years. She is appointed as class counsel.

## IV. CONCLUSION

For the above reasons, the Court grants the following relief:

A. Plaintiffs' motion for partial summary judgment, declaratory judgment and permanent injunction (Dkt. 181) is granted in part and denied in part, as set forth below.

B. Plaintiffs' motion for class certification (Dkt. 180) is granted in full. Definitions for the class and subclasses are as set forth in the body of this Opinion and Order. Attorney Deborah LaBelle is appointed as class counsel.

C. Defendants' cross motion for partial summary judgment contained in their response to Plaintiffs' motion (Dkt. 190) is denied, as set forth below.

D. Plaintiffs are awarded summary judgment on Count V. They are denied summary judgment as to Count VI, without prejudice.

E. Defendants' cross-motion as to Count V is denied. They are denied summary judgment as to Count VI, without prejudice.

F. Plaintiffs are awarded declaratory relief as follows. The Court declares that Mich. Comp. Laws § 769.25a(6) is unconstitutional, as a violation of the Ex Post Facto Clause of the United States Constitution, Art. I § 10.

G. Plaintiffs are awarded permanent injunctive relief as follows. Defendants are permanently enjoined from enforcing or applying Mich. Comp. Laws § 769.25a(6). Within fourteen days of today's date, Defendants shall cause to be calculated the good time credits and disciplinary credits for each subclass member (as defined below) who

has been resentenced, without regard to, or application of, Mich. Comp. Laws § 769.25a(6), for purposes of determining parole eligibility dates. For any subclass member resentenced after today's date, Defendants shall cause such calculations to be made within seven days of resentencing. Defendants shall cause the Michigan Parole Board to assume jurisdiction over subclass members at the time of the earliest release date, as calculated in conformity with this paragraph. The term "subclass members" means all individuals in the custody of the Michigan Department of Corrections who were convicted of first-degree murder for offenses committed when they were below 18 years of age, were or will be subjected to resentencing under Mich. Comp. Laws § 769.25a, are or could become eligible for parole, and whose offenses occurred prior to December 15, 1998.

H. A final partial judgment pertaining to Count V shall be separately entered.

SO ORDERED.


Dated:  April 9, 2018                           s/Mark A. Goldsmith
             Detroit, Michigan                  MARK A. GOLDSMITH
                                                United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 9, 2018.

                                                s/Karri Sandusky
                                                Case Manager