UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HENRY HILL, et al.,

           Plaintiffs,                           Case No. 10-14568

vs.                                      HON. MARK A. GOLDSMITH

GRETCHEN WHITMER, et al.,

           Defendants.

_____/

**OPINION & ORDER**
**DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**WITH RESPECT TO COUNT VI (Dkt. 292)**

The Supreme Court has held that statutorily mandated sentences of life without parole for juvenile offenders are unconstitutional. Montgomery v. Louisiana, – U.S. – , 136 S. Ct. 718, 736 (2016); Miller v. Alabama, 567 U.S. 460, 470 (2012). A sentencing scheme must instead permit courts to consider the hallmark features of youth when sentencing juveniles. Miller, 567 U.S. at 477. Moreover, all but the most incorrigible juvenile offenders are entitled to "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 479 (quoting Graham v. Florida, 560 U.S. 48, 75 (2010)); Montgomery, 136 U.S. at 736.

In this class action, the named Plaintiffs and class members are juvenile homicide offenders who, prior to the Supreme Court's decisions, were sentenced to mandatory life without parole. Now, in light of Montgomery and Miller, they are being resentenced and will, in all likelihood, have the opportunity to appear before the Michigan Parole Board. In Count VI, Plaintiffs claim that they are being deprived of a meaningful opportunity to obtain release because of policies denying them access to certain rehabilitative programs. Defendants have filed a second motion

for summary judgment with respect to Count VI (Dkt. 292).[1]  They argue that summary judgment is warranted on the grounds that class members are not prevented from accessing rehabilitative programming and that, in any event, unfulfilled programming recommendations have not deterred class members from obtaining parole.

As more fully described below, the Court denies Defendants' second motion for summary judgment.  All but the most irredeemable juvenile offenders are entitled to a meaningful opportunity to obtain release based on their demonstrated maturity and rehabilitation.  Access to the very programming that enables juvenile offenders to make such a showing of rehabilitation— and that can play a significant role in parole hearings—is an important component of a meaningful opportunity.  Here, the evidence demonstrates that class members are being denied timely access to programming and that noncompletion of programming has served as a basis for denying or deferring parole for some class members.  The fact that some class members are thereafter provided a later opportunity to obtain parole is of no moment, as states must ensure that all opportunities to obtain release are meaningful.[2]

## I.    BACKGROUND

In response to the Supreme Court's decisions in Miller and Montgomery, the Michigan state legislature amended its statutory scheme that previously excluded juvenile offenders convicted of first-degree murder from the jurisdiction of the Michigan Parole Board.  See Mich. Comp. Laws §§ 750.316, 791.234(6)(a).  The amended statute mandates resentencing for all

---

[1] Defendants are Gretchen Whitmer, Governor of the State of Michigan; Dana Nessel, Attorney General of the State of Michigan; Heidi E. Washington, Director of the Michigan Department of Corrections ("MDOC"); and Michael Eagen, Chair of the Michigan Parole Board.

[2] Because oral argument will not assist in the decisional process, the motion will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

juveniles who were convicted of first-degree homicide offenses before <u>Miller</u> and who received mandatory life-without-parole sentences.  Mich. Comp. Laws § 769.25a.  The statute requires these individuals to be resentenced either to life without parole or to a term of years.  <u>Id.</u> § 769.25a(2).  Prosecutors seeking imposition of a life-without-parole sentence must file a motion specifying the grounds for imposing such a punishment, <u>id.</u> § 769.25a(4)(b), and the sentencing court must hold a hearing on the motion to consider the factors set forth in <u>Miller</u> and other relevant criteria such as the individual's institutional record, <u>id.</u> § 769.25(6).

At the time the present motion was filed, 178 class members had been resentenced out of a total class of 373 individuals.  Parole Grid, Ex. C to Defs. Mot. (Dkt. 292-4).  The vast majority of these class members were resentenced to a term of years.  <u>See id.</u>[3]  Upon being resentenced to a term of years, class members become subject to the parole board's jurisdiction and are assigned an earliest release date ("ERD").  Eagen Dep., Ex. A to Defs. Mot., at 17 (Dkt. 292-2) ("The [class members] we have jurisdiction of are the resentenced ones.  We don't have jurisdiction over the ones that have not been resentenced.").  Some resentenced class members have been immediately eligible for parole consideration based on their ERDs, while others have not yet reached their ERDs.  <u>See</u> Parole Grid.  All class members who have reached their ERDs have had parole hearings.  <u>Id.</u>

In Count VI of the second amended complaint ("SAC"), Plaintiffs contend that Defendants have deprived them of a meaningful opportunity to obtain release in violation of the Eighth and Fourteenth Amendments by failing to provide "programming, education, training, and

---

[3] Although the parole grid is not completely unambiguous, it appears that only eight class members have been resentenced to life without parole.  Parole Grid.  An additional eight resentenced class members appear to be serving life sentences, but the parole grid indicates that seven of them will become eligible for parole on a future date and that one of them will require commutation.  <u>Id.</u>

3

rehabilitation opportunities necessary for Plaintiffs to demonstrate their suitability for release" during resentencing and parole board hearings. SAC ¶¶ 224, 226 (Dkt. 130).[4] Specifically at issue is the allegation that class members who are awaiting resentencing are being denied access to "core" programming. See Hill v. Whitmer, No. 10-14568, 2019 WL 3067977, at *2 (E.D. Mich. July 12, 2019). Core programming for inmates consists of thirteen rehabilitative programs and is recommended for individuals meeting certain criteria upon entry into a prison. Id. MDOC policies provide that priority for enrollment in core programming is given to prisoners in closest proximity to their ERD. Id. Prisoners serving life sentences do not have ERDs, and, therefore, are generally not placed in core programs. Id.

On July 12, 2019, the Court entered an opinion and order (the "July 12 Opinion") granting in part and denying in part Defendants' first motion for summary judgment with respect to Count VI. Id. at *8. In its opinion, the Court held that Defendants were entitled to summary judgment on Count VI to the extent that Plaintiffs alleged that the denial of access to core programming deprives them of a meaningful opportunity to obtain release at the resentencing stage. Id. at *5. The Court concluded that Plaintiffs had failed to proffer any evidence supporting their theory that judges take completion of core programming into account as part of the resentencing decision. Id. at *4-5. In fact, there was no evidence from any of the 139 resentencing hearings that had occurred as of the date of the July 12 Opinion that core programming played any role in those resentencing decisions. Id.

---

[4] At the time Defendants filed the present motion, Count VI was the sole remaining claim. The SAC has since been superseded by the fourth amended complaint, which asserts a new procedural due process claim challenging the allegedly unreasonable delays in class members' resentencing hearings. See Fourth Am. Compl. at 75 (Dkt. 316). However, because Count VI remains the same in both versions of the complaint, references will be made to the SAC.

But the Court also held that lingering factual uncertainties precluded summary judgment as to whether a denial of access to core programming results in deprivation of a meaningful opportunity to obtain release at the parole hearing stage. Id. at *7. Specifically, the Court noted that it was unclear how Defendants' policy has impacted parole decisions for class members who were granted parole and for class members who were denied parole. Id. at *6 n.5, 7.

In their second motion for summary judgment, Defendants provide additional argument and evidence addressing the concerns identified in the Court's July 12 Opinion. Specifically, Defendants contend that MDOC's policies do not exclude class members from accessing core programming. Additionally, Defendants claim to proffer evidence demonstrating that unfulfilled programming recommendations have not prevented class members from obtaining parole. For the reasons discussed below, the Court finds these arguments unpersuasive and concludes that it cannot find, as a matter of law, that Defendants' denial of access to core programming does not deprive class members of a meaningful opportunity to obtain release.

## II.   STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### III.   ANALYSIS

In their motion, Defendants offer two central arguments in support of their position that MDOC's core programming policies do not deprive class members of a meaningful opportunity to obtain release. First, Defendants contend that class members are not excluded from participating in core programming under MDOC's policies. Defs. Reply at 4-5 (Dkt. 295). Second, Defendants maintain that unfulfilled core programming recommendations have not prevented class members from obtaining parole. Defs. Mot. at 4-12.

In addressing these arguments, the Court first examines the underpinnings and scope of juvenile offenders' right to a meaningful opportunity to obtain release and concludes that access to rehabilitative programming is an important element of that right. Next, the Court considers the evidence regarding class members' access to core programming and the role programming has played in class members' parole decisions. Contrary to Defendants' arguments, the evidence demonstrates that MDOC's programming policies deny class members timely access to

programming, and that programming has served as a basis for denying or deferring parole for some class members. Moreover, the fact that class members are provided multiple opportunities to obtain parole is immaterial, as states must ensure that all opportunities to obtain release are meaningful.

### A. Meaningful Opportunity to Obtain Release

The Supreme Court held in Graham that sentences of life without parole for juveniles convicted of nonhomicide offenses are unconstitutional. 560 U.S. at 74. Acknowledging that juveniles are particularly receptive to rehabilitation, the Court noted that policies denying access to rehabilitative services to juveniles serving life sentences render "the disproportionality of the sentence all the more evident." Id. Accordingly, the Court found that while a state need not guarantee eventual freedom to juveniles convicted of nonhomicide offenses, it must provide them "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 75.

The Supreme Court extended Graham's reasoning to "any life-without-parole sentence imposed on a juvenile," when it held in Miller that statutorily mandated life-without-parole sentences for juvenile homicide offenders are unconstitutional. 567 U.S. at 472. Although Miller did not categorically bar sentencing juvenile homicide offenders to life without parole, the Supreme Court held that the occasions for imposing this harsh penalty would be rare. Id. In Montgomery, the Supreme Court made the Miller holding retroactive, and reaffirmed that sentences of life without parole—while not foreclosed for juvenile homicide offenders—are to be reserved only for those "rarest of children, those whose crimes reflect irreparable corruption." 136 S. Ct. at 734. Thus, while those juveniles who have demonstrated an inability to reform will continue to serve life sentences, "[t]he opportunity for release will be afforded to those who

demonstrate the truth of <u>Miller</u>'s central intuition—that children who commit even heinous crimes are capable of change."  <u>Id.</u> at 736.

Read together, <u>Graham</u>, <u>Miller</u>, and <u>Montgomery</u> stand for the proposition that, except for those rare instances where sentences of life without parole are appropriate, juvenile homicide offenders are entitled to a meaningful opportunity for release based on demonstrated maturity and rehabilitation.  Other courts have similarly concluded that the right to a meaningful opportunity to obtain release extends to all but the most incorrigible juvenile homicide offenders.  <u>See, e.g.</u>, <u>Brown v. Precythe</u>, No. 17-04082, 2018 WL 4956519, at *6-7 (W.D. Mo. Oct. 12, 2018) (holding that juvenile homicide offenders were entitled to a meaningful opportunity for release); <u>Md. Restorative Justice Initiative v. Hogan</u>, No. ELH-16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017) (noting the "promise in <u>Graham</u> and <u>Montgomery</u> that a meaningful opportunity for release extends to all juvenile offenders, except for those whose crimes reflect permanent incorrigibility" (internal marks omitted)).[5]

Additionally, because the holdings in <u>Graham</u> and <u>Miller</u> were limited to juvenile offenders, the entitlement to a meaningful opportunity for release is unique to juveniles and does not extend to adult offenders.  <u>See Miller</u>, 567 U.S. at 479; <u>Graham</u>, 560 U.S. at 74-75.  Indeed, Defendant Eagen acknowledged during his deposition that class members are entitled to a meaningful opportunity to obtain parole, a different standard than that which applies to adult offenders.  Eagen Dep. at 212.  This distinction is premised on the diminished moral culpability of juveniles—based on their lack of maturity, underdeveloped sense of responsibility, and

---

[5] Defendants advanced this very position on appeal before the Sixth Circuit.  Br. for Defs.-Appellees at 41, <u>Hill v. Snyder</u>, Sixth Circuit Case No. 17-1252 (Dkt. 24) ("And, while the state is not required to guarantee eventual freedom, in those cases for which a life without parole sentence is not appropriate it must provide some meaningful opportunity for release based on demonstrated maturity and rehabilitation.").  Thus, there is no dispute regarding this issue.

susceptibility to negative influence and outside pressures, as compared with adults. Graham, 560 U.S. at 68. Moreover, it has been recognized that juvenile offenders have greater prospects for reform and rehabilitation. Id. at 74; Miller, 567 U.S. at 471.

As juvenile homicide offenders, class members in the present action are entitled to a meaningful opportunity to obtain release, unless they are determined upon resentencing to be so incapable of reform that a sentence of life without parole is warranted. Thus, there is no doubt that those class members who have been resentenced to a term of years are entitled to a meaningful opportunity to obtain release. For those 195 class members still awaiting resentencing, it is uncertain whether they will be resentenced to life without parole or to a term of years. However, because the Supreme Court has repeatedly emphasized that life-without-parole sentences are appropriate only in the rarest of juvenile cases, it may be compellingly inferred that the overwhelming majority of class members will be resentenced to a term of years and, consequently, are entitled to a meaningful opportunity for release.

What is the scope of this right in the context of rehabilitative programming? There is limited authority examining the issue in the context of juvenile offenders' access to rehabilitative programming. Two courts have addressed juvenile offenders' claims alleging deprivation of the right to a meaningful opportunity to obtain release based on their exclusion from rehabilitative programming. In Greiman v. Hodges, 79 F. Supp. 3d 933, 935 (S.D. Iowa 2015), the plaintiff was a juvenile offender resentenced to life with the possibility of parole. A prison policy allegedly required the plaintiff to complete a sex offender program before he could be released on parole; however, because the plaintiff did not have a defined discharge date due to his life sentence, he was ineligible for the program—prompting his suit that the policy violated the Eighth Amendment. Id. at 936. In denying the defendants' motion to dismiss this claim, the court found that because

9

the department of corrections and parole board "require sex offender treatment as a condition of parole eligibility, Plaintiff is, in effect, denied not just of a meaningful opportunity for parole; he is denied <u>any</u> opportunity for parole." Id. at 944 (emphasis in original).

In <u>Bonilla v. Iowa Board of Parole</u>, 930 N.W.2d 751, 760 (Iowa 2019), the Supreme Court of Iowa considered a petition for judicial review of a ruling by the parole board, in which the petitioner advanced procedural challenges to certain aspects of the parole process. One of these challenges involved the petitioner's claim that the parole board deprived him of a meaningful opportunity to obtain release insofar as he was denied access to rehabilitative programming recommended by the board. Id. at 785.[6] Specifically, the petitioner alleged that he could not be considered seriously for parole until he completed the programming, but that he could not gain access to the program until he was being seriously considered for parole. Id. at 785. In evaluating this claim, the court stated:

> If the state, through the Board, wishes to condition release upon successful completion of certain programing such as [sex offender programming], the department of corrections cannot unreasonably withhold such programming from a juvenile offender. Otherwise, the state could effectively deprive a juvenile offender of a meaningful opportunity to show maturity and rehabilitation by establishing release criteria that the state prevents the juvenile offender from meeting. The department of corrections does not have a pocket veto over the release of a juvenile offender through the withholding of services required by the Board for the release of a juvenile offender.

Id. at 786. The court affirmed the district court's dismissal of the claim on the merits, recognizing that the parole board had only limited authority over the department of corrections. Id. However, the court further stated that juvenile offenders may file claims against the department of corrections if it fails to act reasonably regarding programming. Id. Thus, where a favorable parole decision

---

[6] Although the court held that the petitioner failed to preserve his as-applied challenges to the parole process, it appears to have construed this claim as a facial challenge. Id. at 766, 785-786.

is conditioned on completion of programming, a state is constitutionally obligated to provide the juvenile offender access to such programming.  See id.

Greiman and Bonilla both underscore the significant role programming plays in parole decisions and, consequently, the impact access to programming can have on a juvenile offender's meaningful opportunity to obtain release.  This impact was confirmed in a thorough study of the California parole system, which found that noncompletion of rehabilitative programming frequently served as a basis for denying parole, even where the parole board expressly recognized that the juveniles were ineligible for these programs.[7]

Accordingly, access to the very programming that enables juvenile offenders to demonstrate their rehabilitation can be a fundamental component of a meaningful opportunity to obtain release.  Therefore, in evaluating whether class members in the present case are being denied a meaningful opportunity to obtain release, the Court must examine (i) whether class members are denied access to core programming, and (ii) the evidence submitted regarding the role core programming plays in the Michigan Parole Board's decisions.

**B. Class Members' Access to Programming**

Turning next to the question of class members' access to programming, Defendants dispute Plaintiffs' allegation that MDOC has a policy of excluding prisoners serving life sentences from core programming.  Defs. Reply at 4-5.  According to Defendants, none of MDOC's Policy Directives ("PDs") expressly excludes prisoners serving life sentences from participating in core

---

[7]  See Beth Caldwell, Creating Meaningful Opportunities for Release: Graham, Miller, and California's Youth Offender Parole Hearings, 40 N.Y.U. Rev. L. & Soc. Change 245, 248 (2016).  The study examined the transcripts of parole proceedings for juvenile offenders.  Id. at 299-289.  Based on its findings, the study concluded that "[o]ffering opportunities for young offenders to rehabilitate while they are in prison is fundamental to providing a meaningful opportunity for release," as it would be impossible for them to demonstrate rehabilitation to the parole board without such access.  Id. at 286.

programming.[8]   Rather, PD 05.01.100 provides that "[p]risoner placement into these Core programs shall be prioritized by [ERD]," while MDOC Operating Procedure 05.01.100 specifically provides that "[p]risoners serving a term of life can receive program recommendations but will not be enrolled in . . . [core] program enrollment unless approved by the Program Development Unit, OSAS, or MHS," Operating Procedure 5.01.100, Ex. F to Defs. Reply (Dkt. 295-7).   Thus, Defendants maintain, these policies specifically set forth an avenue for prisoners serving life sentences to participate in core programming.   Defs. Reply at 5.

Defendants' argument is unconvincing.   Perhaps none of MDOC's policies expressly prohibits prisoners serving life sentences from participating in core programming.   But Defendants prioritize prisoners with the earliest ERDs for placement of programming, while declining to assign ERDs to prisoners serving life sentences.   In combination, these practices have the effect of denying timely access to programming to class members awaiting resentencing.

As noted in the July 12 Opinion, the evidence demonstrates that class members "who have yet to be resentenced are denied 'core' rehabilitative programming."   Hill, 2019 WL 3067977, at *2.   For example, in response to a programming inquiry from one class member approaching his resentencing date, an MDOC official stated, "You are currently a lifer and are unable to participate in these programs."   McNeal Dep., Ex. 5 to Pls. Resp., at 63 (Dkt. 274-5).   Likewise, MDOC official Kyle Kaminski acknowledged that because core programming is made available to prisoners based on proximity to their ERDs, "lifers were not at the top of the list to go to programming."   Kaminski Dep., Ex. D to Defs. Mot. for Summ. J., at 41 (Dkt. 267-1).[9]

---

[8]  See  https://www.michigan.gov/corrections/0,4551,7-119-1441_44369---,00.html (last visited May 5, 2020).

[9]  This exhibit does not appear on the docket, as it was filed in the traditional manner.

Although class members may eventually gain access to core programming after they have been resentenced and receive ERDs, this access may not be timely for those individuals whose parole hearings take place shortly after resentencing.  Indeed, as acknowledged by Defendants, those individuals may be unable to complete core programming in advance of parole hearings.  See Defs. Mot. at 15-16.  Therefore, they would be deprived of a meaningful opportunity to demonstrate their maturity and rehabilitation.  Defendants' argument that all prisoners ultimately have the ability to receive programming with appropriate approvals does not address the priority barrier that Defendants have erected.

**C.  The Role of Programming in Parole Decisions**

Next, the Court turns to the issue of whether programming considerations play a role in parole decisions.  Defendants argue that class members are not being deprived of a meaningful opportunity to obtain release because unsatisfied core programming recommendations have not served as a barrier preventing class members from obtaining parole.  In support of this argument, Defendants present evidence (i) demonstrating that many class members have been granted parole despite not having satisfied programming requirements, and (ii) illustrating the circumstances leading to parole denials for four individual class members.  Defs. Mot. at 4-12.  Plaintiffs, in turn, highlight evidence demonstrating that programming does play a significant role in parole determinations.  Pls. Resp. at 5-7 (Dkt. 294).

The Court considers evidence regarding the role core programming plays in parole determinations generally, as well as its impact on both class members who have been granted parole and those who have been denied parole.

### 1. General Impact

Under PD 06.05.100, satisfactory participation in programming results in the addition of one to two points to a prisoner's parole guidelines score. Deposition testimony from Defendant Washington and MDOC official Robert Kosinski confirms that participation in core programming generally increases the likelihood that parole will be granted, and that programming helps prisoners to avoid misconduct which would weigh against their parole. Washington Dep., Ex. 4 to Pls. Resp. to Mot. for Summ. J., at 82-83 (Dkt. 274-4); Koskinski Dep., Ex. B. to Defs. Mot., at 52-56 (Dkt. 292-3). Washington acknowledged the importance of completing programming in advance of a parole hearing, as it decreases an inmate's chances of deferral or denial. Washington Dep. at 82-83. And Richard Stapleton, a former MDOC administrator, stated that the parole board often denies release to prisoners who have not completed recommended programming. Stapleton Aff., Ex. 3 to Pls. Supp. Br., ¶ 22 (Dkt. 67-4).[10] Defendant Eagan, however, noted that the parole board may, in its discretion, waive programming recommendations for long-term prisoners if that programming appears unnecessary. See Eagen Dep. at 107-110, 133. For example, if a prisoner has served ten years without a substance abuse misconduct ticket, the parole board might waive a recommendation for substance abuse programming. Id.

This evidence demonstrates that, overall, programming plays a significant role in parole decisions. Certainly the parole board has the authority to waive programming recommendations as appropriate in individual cases. Nevertheless, Washington and Stapleton confirm that

---

[10] Defendants contend that Stapleton has no personal knowledge regarding the parole board's current treatment of class members, as MDOC has "updated its policies" since Stapleton's retirement in 2011. Defs. Reply at 5. But Defendants' brief does not explain what updating has taken place or how that would undermine Stapleton's affidavit; nor is the statement in Defendants' brief substantiated by any affidavit or other supporting documentation. At this stage, his affidavit remains unrebutted.

noncompletion of core programming recommendations can—and often does—negatively impact parole decisions.

### 2. Class Members Granted Parole

At the time Defendants filed their motion, 178 class members had been resentenced out of a total class of 373 individuals. Parole Grid. Of those 178 resentenced class members, 97 were eligible for parole. See id. Of those 97 class members eligible for parole, 93 (or 95.8%) were released on parole. Id. Only four class members have been denied parole following their first hearing. Id.

Of the 93 class members who were granted parole, the evidence submitted does not indicate the total number who had core programming recommendations. But the evidence does show that fifteen had core programming recommendations that were designated as not completed for one of three reasons: (i) the program was designated "waived" by the parole board, (ii) the program was designated "does not meet criteria," meaning the class member was ineligible for the program based on his or her life sentence, or (iii) the class members were "transferred" (meaning paroled) before completing the program. Relevant Paroled Class Members' CSX-175s, Ex. U to Defs. Mot. (Dkt. 292-22). The parole board thus granted these class members parole despite their unfulfilled programming recommendations. Accordingly, for these class members, an inability to access core programming did not result in a bar to release.

### 3. Class Members Denied Parole

As described above, four of the 97 class members eligible for parole following resentencing were denied parole. Parole Grid. These four class members were Ronald Williams, Marcus Walker, Terrence Kelly, and Willie Servant. Id. Defendants contend that none of these four class members was denied parole on the basis of unfulfilled core programming requirements and that,

consequently, these class members were not deprived of a meaningful opportunity to obtain release based on a lack of access to such programming. Defs. Mot. at 6-10.

In the Court's view, however, this evidence demonstrates the opposite conclusion—that programming served, at least in part, as a basis for three of these class members' unfavorable parole decisions, with Ronald Williams as the exception.

### a. Ronald Williams

Ronald Williams was resentenced on December 2, 2016, to 25 to 60 years' imprisonment for his conviction of first-degree murder. Id. Williams was considered for parole in early 2017, and he received a "no interest" vote on July 26, 2017.[11] Williams Review Log, Ex. E to Defs. Mot. (Dkt. 292-6). The notice of this decision does not indicate the reasons for the no interest vote. See Notice of Decision, Ex. F to Defs. Mot. (Dkt. 292-7). However, as argued by Defendants, it is unlikely that the decision was premised on a failure to complete programming requirements, as Williams completed his only core programming recommendation, for substance abuse, in 1994. See Williams CSX-175, Ex. G to Defs. Mot. (Dkt. 292-8).

Williams had a second parole hearing on June 27, 2019—at the time the present briefing was completed, Williams was still awaiting a decision. See Parole Grid.

### b. Marcus Walker

Marcus Walker was resentenced on March 10, 2017, to 30 to 60 years' imprisonment, and was immediately parole eligible. Parole Grid. Walker had a parole hearing in June 2017 as part of his regular review schedule and another hearing in August 2018 as a result of his resentencing.

---

[11] That is, the parole board denied parole by indicating "no interest" in paroling Williams. See Eagen Dep. at 44.

Walker Review Log, Ex. I to Defs. Mot. (Dkt. 292-10).  After each review, Walker received a vote of no interest.  Id.

The summary interview notes made in connection with Walker's August 2018 parole hearing indicate that he completed his core program recommendation for substance abuse in September 2017.  See Walker Summ. Report at 11, Ex. L to Defs. Mot. (Dkt. 292-13); see also Walker CSX-175, Ex. K to Defs. Mot. (Dkt. 292-12).  The parole board also noted that Walker "has never tried to get in self help programs and quit GED because he never thought he would be released," "has not really made [an] effort to get ready for parole," and had received a misconduct ticket for being involved in a fight the day after his resentencing.  Walker Summ. Report at 7.  The board denied parole "to give [Walker] time to seriously prepare himself for re-entry [into] the community."  Id.  The report also indicates that the board would reconsider Walker for parole early, in two to three years.  Id.

Defendants argue that Walker's parole denial was linked to his recent misconduct ticket, not to programming.  Defs. Mot. at 7-8.  But the parole board additionally noted Walker's failure to participate in programming and his lack of effort in preparing for parole, concluding that he required additional time to prepare himself for reentry into the community.  These comments indicate that Walker was denied parole, at least in part, to afford him additional time to complete rehabilitative programming.  Although the parole board did not specify that they wished to see Walker complete core programming in particular, core programs such as Employment Readiness/Resume Workshop or Thinking for Change are designed to address the parole board's

stated concerns and to prepare prisoners for reentry into the community.[12]  Thus, programming of some kind played a role in Walker's parole denial.

### c.  Terrence Kelly

Terrence Kelly was resentenced on December 18, 2017, to 35 to 60 years' imprisonment. Parole Grid.  Due to an error in his judgment of sentence, Kelly was considered to be eligible for parole in July 2017; however, he does not become eligible until September 2025.  Id.  Due to the error, Kelly had a parole hearing on May 14, 2018, during which the board denied parole and indicated it would reconsider him in eighteen months.  Id.

Although Kelly was considered for parole in error, the circumstances of his denial nevertheless illustrate the board's considerations in rendering parole determinations.  The parole board's summary interview notes reference Kelly's serious misconduct for an assault that occurred ten months previously, for which Kelly minimized his culpability.  Kelly Summ. Report, Ex. P to Defs. Mot., at 7 (Dkt. 292-17).  While the parole board acknowledged that Kelly participated in many self-help programs, it also noted that he was on the waitlist to complete violence prevention programming ("VPP"), a recommendation that had recently been reinstated.  Id. at 7, 12.

In Defendants' view, Kelly's noncompletion of VPP played no role in his parole denial. Defs. Mot. at 9.  But the parole board's notes reflect that Kelly's denial was premised both on his misconduct for assault—the sort of behavior the VPP is designed to prevent—and on his need to complete VPP.  Programming, therefore, played a role in Kelly's parole decision in two respects. First, Kelly was denied parole on the basis of the very behavior VPP is designed to mitigate.

---

[12]  According to MDOC's website, Thinking for Change "is a behavior change program that includes cognitive restructuring, social skills development and the development of problem solving skills."  See https://www.michigan.gov/corrections/0,4551,7-119--140900--,00.html (last visited May 19, 2020).

Second, the parole board expressly noted that Kelly was waiting to complete VPP, a recommendation that had been reinstated.

### d. Willie Servant

Willie Servant was resentenced on May 14, 2018, to 31 to 60 years' imprisonment, and was immediately parole eligible. Parole Grid. Servant had a parole hearing on July 30, 2018, and the board determined that it would reconsider him after twenty-four months. Id. Servant had a second parole hearing on July 11, 2019, and was awaiting the board's decision at the time briefing of this matter was completed. Servant Notice of Intent, Ex. T to Defs. Mot. (Dkt. 292-21).

In connection with Servant's first parole hearing, the parole board noted that after denying his guilt for years, Servant now admits his role but "minimizes his responsibility and shifts blame for his choices onto his codefendant." Servant Notice of Decision, Ex. S to Defs. Mot. (Dkt. 292-20). Thus, the board determined that Servant's "level of insight and accountability are not commensurate with the gravity of his crime." Id. Servant had no programming recommendations prior to his first parole hearing, but the board recommended that he participate in VPP during his continuance period. See Servant CSX-175, Ex. R to Defs. Mot. (Dkt. 292-19). He completed this program on July 25, 2019. Id.

Defendants contend that Servant was denied parole following his first hearing, not because of programming, but because he failed to demonstrate the level of accountability appropriate for his crime. Defs. Mot. at 10. However, the parole board also recommended that Servant complete VPP, indicating that the board's decision was motivated, at least in part, by an intent to afford Servant time to complete that core programming and a belief that the program was capable of addressing the deficiencies that drove the board's decision. The Court previously noted in its July 12 Opinion that there was no indication "that any failure by Servant to complete core programming

led to his denial of release." <u>Hill</u>, 2019 WL 3067977, at *6.  However, at the time the Court rendered that decision, it had not yet received the evidence that the parole board, in fact, recommended that Servant complete VPP.

### 4.  Legal Significance of the Evidence

The evidence in the present case confirms that core programming plays a significant role in parole determinations.  MDOC policies provide that satisfactory participation in programming results in the addition of points to an inmate's parole guidelines score, thereby increasing the likelihood that parole will be granted.  Further, deposition testimony confirmed that the parole board frequently denies parole to inmates who have not completed programming recommendations.  <u>See</u> Stapleton Aff. ¶ 22.

The evidence also demonstrates that although an inability to complete core programming recommendations does not necessarily preclude class members from obtaining favorable parole decisions, it has served as a basis for denying or deferring parole for some class members.  Fifteen class members were granted parole despite not having satisfied programming recommendations. However, programming served, at least in part, as a basis for Walker's, Kelly's, and Servant's unfavorable parole decisions.  And as discussed in the July 12 Opinion, Plaintiffs have adduced evidence demonstrating that Christopher Wiley's and Lorenzo Harrell's parole determinations were deferred for six months pending their completion of VPP, although they were both ultimately released.  <u>Hill</u>, 2019 WL 3067977, at *7.

Given that a lack of core programming has resulted in denials or deferrals of parole, Defendants have not proved that the lack of access to programming will not serve as a barrier preventing at least some of the 195 class members awaiting resentencing from obtaining parole. Because Defendants have failed to present evidence demonstrating that noncompletion of core

programming never influences parole decisions, they have not established as a matter of law that denying class members access to programming does not deprive them of a meaningful opportunity to obtain release.  While it is true that some class members may not need core programming to win parole, that is also irrelevant.  All are constitutionally entitled to be equipped to win their parole, even if all do not need to utilize all of the equipment—much like the right of every person charged with a crime to effective counsel, even if certain defendants could prevail with incompetent counsel.

Defendants argue that even if some class members are initially denied parole on the basis of programming, they are thereafter able to complete the required programming and are reconsidered for parole.  Defs. Mot. at 13-15.  Generally, class members serving term-of-years sentences are eligible for parole reconsideration every one to two years, but may be reconsidered for parole before that time.  Eagen Dep. at 158, 160-161.  Class members serving life sentences with the possibility of parole must serve a minimum of ten to twenty years before being considered for parole; if they are denied parole, they are reconsidered every five years.  Mich. Comp. Laws § 791.234(7)-(8); Eagen Dep. at 27.

To illustrate, Defendants note that Walker's next parole hearing is scheduled for December 2022, Walker Notice of Decision, Ex. J to Defs. Mot. (Dkt. 292-11), but the parole board indicated a willingness to reconsider him early, in two to three years, Walker Summ. Report at 7.  Kelly, in fact, is not eligible for parole until 2025.  See Parole Grid.  Servant is awaiting a decision following his second parole hearing, which occurred a year after his first.  Id.  And Wiley and Harrell were both released on parole less than a year after their parole hearings took place.  Id.  Thus, Defendants maintain that class members who are denied the earliest opportunity to obtain release are not denied their only opportunity.  Defs. Mot. at 15.

But no court has held that a state satisfies its Eighth Amendment obligations so long as some parole hearing is meaningful.  The only logical rule—the only one consistent with the constitutional principle at stake—is that a state must ensure that all opportunities to obtain release are meaningful.  To hold otherwise would condone parole practices amounting to illusory opportunities for release or "repeated incantations of ritualistic denial."  See Bonilla, 930 N.W.2d 772-773.  It would also create uncertainty in the minds of state officials as to exactly when their obligation to satisfy the constitutional standard should commence—creating budgeting, staffing, and other planning challenges.

A rule requiring that all opportunities for release be meaningful recognizes that delay can mean no opportunity at all.  An opportunity for release must be "timely realized," as "'[t]he prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a meaningful opportunity to demonstrate the maturity and rehabilitation.'"  Id. (quoting State v. Null, 836 N.W.2d 41, 71 (Iowa 2013)) (some quotation marks omitted).[13]  Indeed, one commentator has noted that for an opportunity for release to be meaningful, parole review should come not late in life but rather "at a point in time that provides the prisoner with the chance to live a meaningful life outside of prison."  Sarah French Russell, Review for Release: Juvenile Offenders, State Parole Practices & the Eighth Amendment, 89 Ind. L. J. 373, 407-408 (2014).[14]

---

[13] Null acknowledged this principle in concluding that lengthy term-of-years sentences are the functional equivalent of life sentences and are, therefore, subject to the protections set forth in Miller.  836 N.W.2d at 71.

[14] Professor Russell reasons that "review must occur at a point in time that will give a prisoner a sense of hope about the future and that reflects society's hope that the prisoner can rejoin society in a meaningful way."  Id.  Creating this sense of hope, in turn, motivates rehabilitation efforts and good behavior, whereas "'[a] young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual.'"  Id. (quoting Graham, 560 U.S. at 79).

Because lifespan is a precarious and wasting asset, the failure to provide meaningful review at a first parole hearing could render future review of limited utility—or preclude meaningful review entirely.  If a class member is denied parole based on a failure to complete core programming to which he was denied access, he would be deprived of his <u>first</u> opportunity to obtain release and possibly his <u>only</u> opportunity.

This risk is all the more apparent for class members resentenced later in life.  Indeed, Plaintiffs maintain that there are ten class members between the ages of fifty-five and sixty who have yet to be resentenced and who have unfulfilled programming requirements.  Pls. Resp. at 22-23.  These ten class members have already exceeded the average lifespan of a prisoner incarcerated in Michigan.  <u>See, e.g.</u>, <u>Kelly v. Brown</u>, 851 F.3d 686, 688 (7th Cir. 2017) (Posner, J., dissenting) (noting that the life expectancy for a juvenile offender serving a life sentence in a Michigan correctional facility is 50.5 years).  Thus, it is critical that class members be afforded a meaningful opportunity to obtain release during their first parole hearing.

All opportunities to obtain release provided by Defendants, therefore, must be meaningful.  As a result, Defendants are not entitled to summary judgment on their theory that class members initially denied parole on the basis of unsatisfied programming recommendations may be provided a meaningful opportunity for release thereafter.

Next, Defendants contend that they are unable to enroll class members awaiting resentencing in core programs based on presumptive ERDs, as county prosecutors are seeking life without parole in the vast majority of these cases.  Defs. Reply at 6 (citing List of Class Members Not Resentenced, Ex. G to Defs. Reply (Dkt. 295-8)).  Though not expressly stated, Defendants imply that core programming would be unnecessary for those class members who ultimately become ineligible for parole following resentencing.

But at the present stage, 195 class members await resentencing after their statutorily mandated sentences of life without parole were rendered unconstitutional under <u>Miller</u> and <u>Montgomery</u>.  Given the resentencing delays acknowledged in recent briefing, <u>see</u> Defs. Mot. to Dismiss Count VIII at 10-11 (Dkt. 320); Pls. Resp. to Mot. to Dismiss Count VIII at 2 (Dkt. 322), it is unlikely that these class members are to be resentenced imminently.  In the meantime, it would be inequitable to deprive all class members awaiting resentencing access to core programming simply because some may become ineligible for parole—particularly in light of the Supreme Court's ruling that sentences of life without parole must be reserved for only those rare juvenile offenders "whose crimes reflect permanent incorrigibility."  <u>See</u> <u>Montgomery</u>, 136 S. Ct. at 734.  The Court, therefore, rejects Defendants' argument.

Finally, Defendants argue that, in light of the limited enrollment capacity for core programming, prioritizing enrollment of class members awaiting resentencing would harm other prisoners who may be placed lower on the waiting list.  Defs. Reply at 6-7.  This argument, however, concerns the structure of any remedy that might ultimately be ordered, and not whether relief is unjustified as a matter of law.  That is, the question of which prisoners are entitled to the greatest priority for enrollment in core programming may well present competing equities, but it does not undermine the validity of the class members' claim.

Defendants, therefore, have not established that, as a matter of law, their policy of denying class members access to core programming does not result in a deprivation of their right to a meaningful opportunity to obtain release.

## IV.   CONCLUSION

For the reasons stated above, Defendants' second motion for summary judgment with respect to Count VI is denied (Dkt. 292).

SO ORDERED.

Dated:  June 2, 2020                                    s/Mark A. Goldsmith
     Detroit, Michigan                          MARK A. GOLDSMITH
                                               United States District Judge